UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

───────────────

№ 13-CV-3439 (JFB)(WDW)

───────────────

Tianbo Huang,

Plaintiff,

versus

iTV Media, Inc., iTV Media (Hong Kong), Ltd., iTV.cn, Inc., and Song Lin,

Defendants.

───────────────

**MEMORANDUM AND ORDER**
January 16, 2015

───────────────

Joseph F. Bianco, District Judge:

Plaintiff Tianbo Huang ("plaintiff") brings this action for breach of contract, fraud, and related claims based upon promises allegedly made to him before he was hired by iTV Media. In short, plaintiff alleges that defendants—various iTV entities and their President and Chief Executive Officer, Song Lin—promised him certain responsibilities and compensation in his new position, but did not keep those promises once plaintiff began working for iTV.

The Court previously granted in part and denied in part defendants' motion to dismiss. *See Huang v. iTV Media*, No. 13-cv-3439 (JFB)(WDW), 2014 WL 1377500 (E.D.N.Y. Apr. 8, 2014). As part of that order, the Court dismissed plaintiff's claim for punitive damages, but granted him leave to amend the complaint with respect to that claim. Defendants now move under Federal Rules of Civil Procedure 12(b)(6) and 12(f) to dismiss plaintiff's claim for punitive damages.[1] As set forth below, the motion to dismiss is granted because the allegations contained in the Second Amended Complaint cannot support a punitive damages award under New York law.

I. Background

A. Factual Background

The factual background of this case is set forth in the Court's prior order. Of particular relevance to this motion, plaintiff alleges that defendant Lin promised him three things in order to induce plaintiff to leave his position with one of the largest Chinese internet television companies, where he enjoyed significant responsibilities. (Second Am. Compl. ¶¶ 18-20.) Lin allegedly promised that iTV

───────────────

[1] Defendants have withdrawn their motion to dismiss plaintiff's claim for liquidated damages.

Media would hold an initial public offering within one year of plaintiff's hiring, which would increase the value of the stock options they planned to give him. (*Id.* ¶ 26.) Lin also promised that plaintiff would direct iTV's global operations, including responsibility for all of North America and the management of an entity to be created for that purpose. (*Id.* ¶ 27.) Finally, Lin allegedly promised plaintiff annual compensation of at least $300,000, apart from the stock options. (*Id.* ¶ 28.) According to the Second Amended Complaint, Lin never intended to keep any of these promises, and made them solely to induce plaintiff to leave his position with another company, so that defendants could exploit his expertise in internet television. (*Id.* ¶¶ 29-32.)

Plaintiff alleges that iTV never granted him the promised stock options (nor held an initial public offering), and that his salary was underpaid as well. (*Id.* ¶¶ 41-45.) Furthermore, once plaintiff began working for iTV, Lin allegedly prevented him from managing international operations. (*Id.* ¶ 39.) Plaintiff alleges that he complained, and that he was terminated in retaliation for those complaints. (*Id.* ¶ 54.)

In its previous order, the Court dismissed the punitive damages claim because it lacked any allegation that the fraud was "aimed at the public generally" and, thus, "necessary to vindicate a public right." *TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 93-94 (2d Cir. 2005) (internal quotation marks and citations omitted). The earlier complaint included the allegation that, with the aim of masking their fraud, defendants issued plaintiff a W-2 which overstated his salary and forced him to pay more in taxes than his actual salary warranted. (Am. Compl. ¶¶ 54-55.) In the Second Amended Complaint, plaintiff adds more detail to the allegations surrounding the W-2, and also adds that defendants failed to withhold and contribute funds on plaintiff's behalf as required by the Federal Insurance Contributions Act, thereby depriving the state and federal government of payments needed for social welfare programs. (Second Am. Compl. ¶¶ 106-11.)

B. Procedural History

Plaintiff filed the original Complaint in this case on June 14, 2013, and an Amended Complaint on September 12, 2013. On April 8, 2014, the Court granted (in part) defendants' motion to dismiss. Plaintiff filed the Second Amended Complaint on May 8, 2014, and defendants moved to dismiss the punitive damages claim on July 3, 2014. Plaintiff responded in opposition on August 15, 2014, and defendants replied on August 29, 2014. The Court heard oral argument on October 29, 2014.

II. STANDARD OF REVIEW

In reviewing a motion to dismiss pursuant to Rule 12(b)(6),[2] the Court must

---

[2] Defendants cited both Rule 12(b)(6) and Rule 12(f) as ground for their motion, and acknowledge the lack of clarity about whether one of these sub-sections more properly applies. The Second Circuit has affirmed the dismissal of a punitive damages claim under Rule 12(b)(6), *see N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 130 (2d Cir. 2001), though it did so without discussing Rule 12(f). Conversely, another court in this district applied Rule 12(f) to a similar claim, without addressing Rule 12(b)(6). *See Wyeth v. King Pharmaceuticals, Inc.*, 396 F. Supp. 2d 280, 293 (E.D.N.Y. 2005). However, the standard applied in *Wyeth* is functionally the same as the standard applied under Rule 12(b)(6): the court there stated that Rule 12(f) required the defendant "to show three things: (1) that no question of fact which might allow Plaintiff's claim to proceed exists; (2) that no substantial question of law, a resolution of which would help the Plaintiff's claim succeed, exists; and (3) that it is

accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). "In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'" *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)).

The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, reaffirming two important considerations for courts deciding a motion to dismiss. 556 U.S. 662 (2009). The Court instructed district courts to first "identify[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679 (explaining that though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations"). Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting and citing *Twombly,* 550 U.S. at 556–57 (internal citation omitted)).

On a motion to dismiss, a court may examine "documents attached to [the complaint] or incorporated in it by reference." *Nasso v. Bio Reference Labs., Inc.*, 892 F. Supp. 2d 439, 446 (E.D.N.Y. 2012) (quoting *In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003)) (internal citations omitted). Here, plaintiff attached his employment contract as an exhibit to the Second Amended Complaint, and the Court has considered its terms without objection by either party.

III. DISCUSSION

In *Rocanova v. Equitable Life Assur. Socy. of U.S.*, the New York Court of Appeals set forth the following standard applicable in cases where a contracting party seeks punitive damages:

> Punitive damages are not recoverable for an ordinary breach of contract as their purpose is not to remedy private wrongs but to vindicate public rights. . . . However, where the breach of contract also involves a fraud evincing a "high degree of moral turpitude" and demonstrating "such wanton dishonesty as to imply a criminal indifference to civil obligations," punitive damages are recoverable if the conduct was "aimed at the public generally."

83 N.Y.2d 603, 613 (1994). Courts have since interpreted *Rocanova* to impose the following requirements: "a plaintiff must establish that the defendant's conduct: (1) is actionable as an independent tort; (2) was

---

prejudiced by the inclusion of this claim." *Id.* At least under the circumstances of this case, that standard produces the same result as analysis under Rule 12(b)(6). Accordingly, although the Court sets forth the Rule 12(b)(6) standard below, it has considered both standards and concludes that defendants' motion should be granted under either.

sufficiently egregious; and (3) was directed not only against the plaintiff, but was part of a pattern of behavior aimed at the public generally." *Leviton Mfg. Co., Inc. v. Reeve*, 942 F. Supp. 2d 244, 270 (E.D.N.Y. 2013); *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 316 (1995) (describing these requirements as "pleading elements").

As a threshold matter, the New York Court of Appeals has clarified that the *Rocanova* requirements apply if the tortious conduct at issue "'has its genesis in the contractual relationship.'" *Leviton*, 942 F. Supp. 2d at 270 (quoting *New York Univ.*, 87 N.Y.2d at 316); *see also Rocanova*, 83 N.Y.2d at 613-14 (considering whether the tortious conduct "constitute[ed], accompan[ied], or [was] associated with the breach of contract," or was "arising out of" the contractual relationship).[3] If the tortious conduct is so independent that it has no genesis in the contractual relationship, *Rocanova* would not apply, and the availability of punitive damages would be governed by the ordinary standard, without the public-aim requirement discussed below. *See Langenberg v. Sofair*, No. 03 Civ. 8339(KMK)(FM), 2006 WL 3518197, at *4 (S.D.N.Y. Dec. 7, 2006).

Plaintiff argues that *Rocanova* does not apply to his fraudulent inducement claim because his allegations concern his negotiations with defendants, which preceded his employment contract. Therefore, plaintiff contends, defendants' pre-contract conduct cannot arise out of or have its genesis in the later contract. The primary case on which plaintiff relies does suggest that the chronology of the fraudulent inducement allegations and the subsequent contract can determine whether *Rocanova* applies. *See Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 380 F. Supp. 2d 250, 266 (S.D.N.Y. 2005). However, *Topps* did not hold that fraudulent inducement claims—which by their nature generally contain allegations of conduct occurring before the execution of a contract—*never* arise out of, or have their genesis in, a contractual relationship. In fact, *Topps* held the opposite, and found that the parties' contractual relationship gave rise to the allegedly tortious conduct, thus barring punitive damages for the plaintiff's fraudulent inducement claim. 380 F. Supp. 2d at 266. *Topps* based its conclusion on the parties' long-term contractual relationship. To the extent plaintiff suggests that *Rocanova* can never apply to first-time contracting parties (like plaintiff and defendants here), this Court disagrees. Such a rule would vastly expand the availability of punitive damages in contracts cases under New York law. In fact, the Court is aware of no New York state court decision that has exempted all fraudulent inducement claims in cases involving first-time contracting parties from the *Rocanova* test.[4] Accordingly, to the extent plaintiff interprets *Topps* to hold that actions for fraudulent inducement to contract are automatically excluded from the public-aim requirement of *Rocanova*, this Court respectfully

---

[3] The Second Circuit and district courts within this circuit have employed the same or similar language. *See, e.g.*, *Carvel Corp. v. Noonan*, 350 F.3d 6, 25 (2d Cir. 2003) (considering whether alleged tort was "directly related" to the contract); *Carling v. Peters*, No. 10 Civ. 4573(PAE)(HBP), 2013 WL 865842, at *7 (S.D.N.Y. Mar. 8, 2013) ("As the Second Circuit has explained, there is a critical difference between fraud claims that arise out of a contract and those that do not.").

[4] Although one federal case suggests that this distinction may be dispositive, it does not cite any New York state cases on that issue, nor does it address *Rocanova* or the greater implications of such a rule. *See Lagenberg v. Sofair*, No. 03 Civ. 8339 (KMK) (FM), 2006 U.S. Dist. LEXIS 88157, at *13 (S.D.N.Y. Dec. 7, 2006) (report and recommendation).

4

disagrees. Instead, fraudulent inducement claims that have their genesis in the contractual relationship, including an attempt to form the contractual relationship, are analyzed under *Rocanova*.

Other courts have similarly concluded that *Rocanova* can still apply to fraudulent inducement claims, including where, as here and as is often the case, the fraud is alleged to have preceded the execution of the contract. *See, e.g.*, *Mayline Enters., Inc. v. Milea Truck Sales Corp.*, 641 F. Supp. 2d 304, 311-12 (S.D.N.Y. 2009); *Ventus Networks, LLC v. Answerthink, Inc.*, No. 05 Civ. 10316 (DAB), 2007 WL 582736, at *2-3 (S.D.N.Y. Feb 22, 2007); *Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 248 (S.D.N.Y. 2006); *Merrill Lynch Co., Inc. v. Allegheny Energy, Inc.*, 382 F. Supp. 2d 411, 423 (S.D.N.Y. 2003).

In the instant case, the allegations of fraudulent inducement here are directly related to and rooted in the parties' contractual relationship, even if it was not long-term. The claim alleges three misrepresentations: that iTV Media would hold an initial public offering within one year of plaintiff's employment, that plaintiff would oversee all international operations, and that plaintiff would be paid a certain salary. (Second Am. Compl. ¶¶ 101-02.) All of these misrepresentations are alleged to have occurred before the execution of the contract (Compl. ¶¶ 26-27), but each has its "genesis in the contractual relationship," *New York Univ*, 87 N.Y.2d at 316. The parties began that relationship in order to negotiate plaintiff's employment terms, and the alleged misrepresentations were made in the course of that relationship. Furthermore, each alleged misrepresentation was eventually memorialized in the contract itself, which describes plaintiff as "President, iTV Media International" with responsibility for the "global market," and sets forth a specific salary along with stock options, the value of which is directly connected to the promised initial public offering. (Ex. A to Second Am. Compl. at 2-3.) As a result, all three of the allegedly fraudulent misrepresentations are also highlighted within plaintiff's breach of contract claim. (Second Am. Compl. ¶¶ 81, 85, 86, 90.) Thus, the alleged misrepresentations have their genesis in the parties' contractual relationship, and *Rocanova* applies to plaintiff's fraudulent inducement claim.

Accordingly, the Court concludes that *Rocanova* governs the availability of punitive damages in this case. As set forth below, applying the three-part *Rocanova* test to the allegations in the instant case, plaintiff cannot state a plausible claim for punitive damages, and such claim cannot prevail here as a matter of law.

1. Independent Tort

Because, as noted, punitive damages are not ordinarily available for breach-of-contract claims, the first task under *Rocanova* is to identify independently tortious conduct. *New York Univ.*, 87 N.Y.2d at 316. Plaintiff's fraudulent inducement claim satisfies this requirement. Although the claim's allegations arise out of the contract, they nonetheless describe conduct that courts have found to be sufficiently independent under *Rocanova*'s first requirement. *See id.*; *Merrill Lynch*, 382 F. Supp. 2d at 423.

2. Egregiousness

The second requirement for punitive damages is that the alleged conduct be sufficiently egregious. "To establish that a defendant's fraudulent conduct was

5

sufficiently egregious and morally culpable to satisfy the second element, a plaintiff must allege facts that evince a 'high degree of moral turpitude' or 'such wanton dishonesty as to imply a criminal indifference to civil obligations.'" *Ventus*, 2007 WL 582736, at *3 (quoting *Rocanova*, 83 N.Y.2d at 613).

Here, as in *Ventus*, even if the allegations (viewed in a light most favorable to plaintiff) demonstrate a "clear intent to defraud," *id.*, the conduct they describe is not egregious enough to warrant punitive damages. Punitive damages "have been refused in the 'ordinary' fraud and deceit case," *Walker v. Sheldon*, 10 N.Y.2d 401, 405 (1961), and the allegations in the Second Amended Complaint do not set plaintiff's claim apart. For example, plaintiff has identified no authority suggesting that any conduct analogous to the alleged failure to hold a promised initial public offering, or to grant an employee the expected level of authority, involves any degree of "moral turpitude," much less a high one, or is so wanton as to "imply a criminal indifference." *Rocanova*, 83 N.Y.2d at 613. In fact, plaintiff did not address this element in his papers at all. To the extent that defendants' allegedly false reporting caused the imposition of a higher tax burden on plaintiff, that allegation alone is not egregious enough to warrant punitive damages. *Cf. Schonfeld v. Hilliard*, 218 F.3d 164, 184 (2d Cir. 2000) (holding that alleged failure to provide $20 million in promised funding was not sufficiently egregious).

Having independently examined the Second Amended Complaint, accepted its allegations as true, and viewed those allegations in a light most favorable to plaintiff, the Court concludes, as a matter of law, that the allegations describe ordinary commercial fraud, and lack the egregiousness required to support a plausible claim for punitive damages under New York law.

3. Public Aim Requirement

In an abundance of caution, the Court will also consider whether the Second Amended Complaint satisfies the third *Rocanova* requirement, that the fraud "was directed not only against the plaintiff, but was part of a pattern of behavior aimed at the public generally." *Leviton*, 942 F. Supp. 2d at 270. "When the Court of Appeals articulated the public aim requirement in *Rocanova* and . . . in *New York University,* it invoked an earlier distinction between 'a gross and wanton fraud upon the public' and 'an isolated transaction incident to an otherwise legitimate business.' . . . The latter, it implied, would not constitute conduct aimed at the public generally." *TVT Records*, 412 F.3d at 95.

The allegations in this case clearly describe "an isolated transaction" that fits within the latter category. First, the Second Amended Complaint describes fraud with respect to a single contract,[5] not a "pattern" or broader scheme of behavior. *Id.* at 93 (citation omitted); *cf. Mayline Enters.*, 641 F. Supp. 2d at 312 (dismissing claim for punitive damages based on allegation of a "single incident" as opposed to "evidence that [the defendant] customarily alters odometers").

Second, punitive damages in this case would not "vindicate public rights,"

---

[5] Although the Second Amended Complaint alleges that other employees were underpaid (Second Am. Compl. at ¶¶ 40, 46-47), alleging a pattern of underpayment is not equivalent to alleging fraud, much less alleging a broader scheme aimed at the general public.

6

*Rocanova*, 83 N.Y.2d at 613, because the allegations do not describe conduct that was "directed" or "aimed at" the general public. *Leviton*, 942 F. Supp. 2d. at 270. Instead, plaintiff alleges that defendants aimed at him, and that there was some incidental effect on the general public, in the form of funds that should have been paid under the Federal Insurance Contribution Act. (*See* Compl. ¶ 111.) However, a fraudulent scheme that allegedly affects the general public in some way is not the equivalent of a fraud that *targets* the public. *See TVT Records*, 412 F.3d at 95 (distinguishing between "incidental effects" and "conduct directed at the public generally"). For example, in *United States v. Merritt Meridian Constr. Corp.*, the Second Circuit concluded that the fraud at issue was not aimed at the general public even though the defendant contractor, who committed fraud against a subcontractor, did so while being paid by the government to build facilities at West Point, and thus effectively over-charged the public for its services. *See* 95 F.3d 153, 161 (2d Cir. 1996).

Likewise, an alleged effect on public funds, whether related to a tax dispute or FICA payments, does not change the *orientation* of defendants' conduct: plaintiff claims that defendants singled him out. (*See* Second Am. Compl. ¶¶ 21-28.)[6] Thus, it is apparent on the face of the Second Amended Complaint that plaintiff is the only alleged victim of defendants' fraudulent inducement, and that the alleged conduct was not a "general business practice" of theirs aimed "'to trap generally the unwary.'" *Mayline*, 641 F. Supp. 2d at 311 (quoting *Walker*, 10 N.Y.2d at 490); *cf. Ventus*, 2007 WL 582736, at *4 ("The Second Amended Complaint contains no allegations that any individual or entity other than plaintiff was the victim of Defendant's allegedly fraudulent scheme. Accordingly, Plaintiff's allegations do not contain a 'sufficiently public component to support punitive damages.'" (quoting *TVT Records*, 412 F.3d at 95)). For these reasons, the Second Amended Complaint does not satisfy *Rocanova*'s public-aim requirement.

---

[6] The sole case on which plaintiff relies is readily distinguishable. In *Ball v. Cook*, the defendant assisted the plaintiff in filing public documents concerning the ownership status and title to expensive pieces of artwork, which misrepresented that information to the entire market because the defendant had in fact stolen the artwork from the plaintiff. *See* No. 11 Civ. 5926 (RJS), 2012 WL 4841735, at *12 (S.D.N.Y. Oct. 9, 2012). Although the present case likewise involves allegations related to public documents (plaintiff's W-2 and presumably any other documents related to plaintiff's salary and withholding by defendants), there are no similar allegations here that the alleged fraud occurred in "numerous" transactions "over a period of years," or that the misrepresentations were ever aimed at an audience analogous to an entire market of art buyers. At most, any misrepresentations here were directed toward plaintiff and the IRS, which actually appears to have benefited from the alleged fraud, because plaintiff alleges that he was over-charged in taxes because defendants paid him less than what they reported to the IRS. (Second Am. Compl. ¶ 108.) Even if some other government agency or fund was underpaid or overpaid due to insufficient withholding (*see id.* ¶ 111), such "incidental effects" are insufficient to convert this isolated instance of alleged fraud into one aimed at the public generally. *TVT Records*, 412 F.3d at 95.

## IV. Conclusion

In sum, the allegations in the Second Amended Complaint do not describe conduct that, under New York law, could plausibly warrant the award of punitive damages, because the alleged fraud is not sufficiently egregious, nor was it aimed at the general public. Accordingly, defendants' motion to dismiss the claim for punitive damages is granted.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: January 16, 2015
      Central Islip, NY

\* \* \*

Plaintiff is represented by Eugene Meyers, Dacheng Law Offices, 2 Wall Street, 21st Floor, New York, NY 10005. Defendants Lin and the iTV Group are represented by Donald F. Schneider, Silverman Sclar Shin & Byrne PLLC, 381 Park Avenue South, New York, NY 10016. Defendant UTS is represented by Charles A Michael, Brune & Richard LLP, One Battery Park Plaza, 34th Floor, New York, NY 10004.